IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | 21 Cr. 569 (VSB) |
| QAADIR WILLIAMS, | The Hon. Vernon S. Broderick |
| Defendant. | |

# DEFENDANT QAADIR WILLIAMS' SUPPLEMENTAL SENTENCING MEMORANDUM

SEAN M. MAHER
*Counsel for Defendant Qaadir Williams*

Table of Contents

Preliminary statement ....................................................................................1

1.  The facts and context demonstrate that Mr. Williams
    was fearful and trying to protect himself and those with him. ..............2

2.  Reckless endangerment is the correct felony offense to
    consider under U.S.S.G. § 2K2.1(c)(1). ...................................................7

    A.  The facts support a finding by the preponderance of
        the evidence that the felony of reckless endangerment
        in the first degree was committed with the charged
        ammunition offense for sentencing purposes under
        U.S.S.G. § 2K2.1(c)(1). ……………………………….…………7

    B.  The facts do not support a finding by the preponderance
        of the evidence that Mr. Williams intended to kill
        anyone with malice aforethought, thus both first and
        second degree murder are inapplicable under
        U.S.S.G. § 2K2.1(c)(1). ................................................................11

    C.  Transferred intent is recognized in the Second Circuit,
        however it is inapplicable because Mr. Williams did not
        have the requisite *mens rea* to commit murder in the first
        or second degree. ..................................................................15

    D.  Aggravated assault is inapplicable under
        U.S.S.G. § 2K2.1(c)(1). ............................................................16

Conclusion .................................................................................................17

## Preliminary Statement

Qaadir Williams, by undersigned counsel, respectfully submits this supplemental sentencing memorandum to assist the Court in answering the Court's questions concerning the appropriate Guidelines calculation in this matter. The questions posed by the Court to the parties can be summarized as:

> (1) If there was a felony committed in connection with the instant offense, what was it?
>
> (2) In determining the correct felony, how do the first degree murder elements of premeditation and intent to kill relate to the facts at hand?
>
> (3) If there was an intent to kill, can it be transferred to a different person?

When viewed in a light most favorable to the government and evaluated by a preponderance of the evidence standard,[1] the facts at most support the notion that reckless endangerment in the first degree was the most severe felony committed by Mr. Williams in connection with illegally possessing shell casings as charged in the indictment. Because reckless endangerment does not trigger a higher offense level than the base offense level under U.S.S.G. § 2K2.1(a)(6)(A), the Court should accept the Guidelines calculation previously proffered by the Probation Office and Mr. Williams.

---

[1] *United States v. Cordoba-Murgas*, 233 F.3d 704, 709 (2d Cir. 2000)(upholding the use of the preponderance of the evidence standard).

1

## 1. The facts and context demonstrate that Mr. Williams was fearful and trying to protect himself and those with him.

Along with supplemental legal briefing, the parties are submitting a statement of stipulated facts. Those stipulated facts are incorporated herein by reference. There are other facts the Court should consider when evaluating whether to impose additional levels under U.S.S.G. § 2K2.1(c)(1) that should be contextualized from Mr. Williams' perspective.

Drama set off the chain of events by robbing Cerezo of $700 when Cerezo tried to buy marijuana from Drama at or near the Bodega. Cerezo came back to the area armed with a gun while looking for Drama. Mr. Williams had nothing to do with any of the interactions between Drama and Cerezo.

Mr. Williams' family lives in the apartment building immediately adjacent to the Bodega. Mr. Williams, some of his family, and friends were on the sidewalk outside of the apartment building next to the Bodega when Cerezo returned with a gun looking for Drama. In his sentencing submission, Cerezo declared that he was high on PCP when he had the gun looking for Drama.[2] When Mr. Williams saw Cerezo reach for a gun as Cerezo walked past the people congregated on the sidewalk, Mr. William's instantly moved to disarm Cerezo to protect and defend himself and those around him. The stipulated facts and video footage confirms this.

Cerezo's erratic and dangerous behavior continued when he returned to the Bodega around 6:58 p.m. armed with a gun looking for Drama. Cerezo banged on

---

[2] Cerezo sentencing submission at 2, Doc. No. 24, 20 Crim. 622 (PGG), filed 08/13/2021.

2

the locked front gate with a gun, which he pointed inside the gate.

When Mr. Williams, his family, and friends were gathered again outside of the apartment building around 9:15 p.m., Mr. Williams and a few others were armed. Mr. Williams did not have a gun in order to chase anyone down. At that point, he didn't know Cerezo or whether Cerezo would come back again with a gun. Mr. Williams, however, did want to be able to protect himself and his family.

Mr. Williams did not go walking around the neighborhood looking for Cerezo, Drama, or anyone else. Mr. Williams and those with him stayed in the area in front of the Williams' apartment building and the Bodega.

Government's Exhibits A and B depict the actual shooting incident that occurred around 9:15 p.m. Exhibit A shows the group of people with Mr. Williams standing in front of the Williams' apartment building at 666 East 233rd Street and the Bodega right next door to the west. Exhibit B shows Drama and two men drive up and double park a few stores further west of the Bodega on East 233rd Street. The time stamps on the two videos are not in sync, so events that occur in the two videos need to be compared by watching the flow of events. After comparing events, it appears that there is a 26 second difference in the time counts between the two videos, with Exhibit B being 26 seconds behind Exhibit A. For instance, when the first gun shot appears to go off 16 seconds into Exhibit A, there is a discernable physical reaction displayed by people in Exhibit B consistent with hearing gunshots for the first time that occurs 42 seconds into the Exhibit B footage.

On the following page is a chart showing when key events occur in the Exhibits A and B videos. The table is formatted so that the real time lines up across the rows even though the elapsed time in each video is approximately 26 seconds off.

| **Exhibit A** | | **Exhibit B** | |
|---|---|---|---|
| **Elapsed Time** | **Events** | **Elapsed Time** | **Events** |
| | | 0:11 | Car with Drama and 2 men double parks |
| | | 0:26 | Drama walks on sidewalk, begins to walk to Bodega |
| | | 0:31 | Drama moves off screen at bottom; Man 1 with shoulder bag walks onto sidewalk |
| | | 0:32 | Man 1 begins shifting gun in left hand to right hand across front of his body in manner visible to anyone looking at him |
| 0:07 | Drama appears at bottom of screen in hoodie | 0:33 | *[Offscreen - Drama appears at bottom of Exhibit A screen in hoodie]* |
| 0:10 | Drama goes into Bodega | 0:36 | *[Offscreen – Drama goes into Bodega]* |
| 0:16 | First visible shot fired | 0:42 | People appear to react to gunfire; 2 men begin to run away from direction of Bodega |
| 0:21 | Mr. Williams fires single shot with muzzle flash | 0:47 | 2 men are now 3-4 car lengths further away from the back of their double parked car |
| 0:27 | Mr. Williams walks into family apartment building | | |
| 0:33 | Drama runs out of the Bodega | 0:59 | *[Offscreen - Drama runs out of the Bodega]* |
| | | 1:05 | Drama runs back into frame at the bottom |
| | | 1:12 | 2 men walking back to their double-parked car |
| | | 1:26 | Man 1 who had gun and shoulder bag turns around and walks away while Man 2 continues to the double parked car |
| | | 1:38 | Man 2 gets into driver's seat of the double parked car |
| | | 1:45 | Man 2 drives forward towards the Bodega to leave the scene |

5

The video footage in Exhibits A and B is consistent with Mr. Williams' understanding of what happened. As Drama was walking towards the Bodega in a non-threatening manner, Man 1 stepped onto the sidewalk with a gun visible in his left hand that he then moved across his body into his right hand. When Drama walked into the Bodega, the attention of the man next to Mr. Williams seemed to be focused past the Bodega in the direction of the 2 men. The man next to Mr. Williams then makes a sudden move to his left and appears to fire into the Bodega. It is unclear whether this is the actual first shot or and instantaneous reaction to a shot being fired from inside the Bodega by Drama.

Mr. Williams did not see Cerezo or Drama. The one and only visible gunshot made by Mr. Williams occurs 5 seconds after the first visible shot and after a flurry of shots by other individuals. Mr. Williams stepped behind a car and shot in a westward direction towards the area where the 2 men were. When Mr. Williams fired that shot, the two men had already been running from their double-parked car for several seconds. By the time Mr. Williams fired, the 2 men where at least 3-4 car lengths further down the hill away from the Bodega than when the first shot rang out. The 2 men were still moving away from the area and the pathway between them and Mr. Williams was blocked with at least one double-parked car when Mr. Williams shot the gun.

After discharging one round, Mr. Williams walked across the sidewalk and into the family apartment building. He and the people with him did not chase Drama and the 2 men. Mr. Williams did not wait 30 seconds to shoot the 2 men as

6

they walked back to their double-parked car. Mr. Williams did not shoot at Man 2 when Man 2 drove off in the car right past the Bodega. Mr. Williams and those with him did not stay on the sidewalk to kill Drama as he emerged a few seconds later from the Bodega.

Mr. Williams fired the gun as a warning for the 2 men down the street to stay away. Mr. Williams was not trying to shoot Cerezo because as far as Mr. Williams knew, neither of these men were Cerezo or were with Cerezo. Also, by 9:15 p.m. Mr. Williams already knew that if Cerezo came back to the neighborhood, Cerezo would be looking to retaliate against Drama, not Mr. Williams. As far as Mr. Williams was concerned, the 2 men posed an unknown immediate life-threatening danger to himself and those with Mr. Williams. Being on a steep hill, the direction that Mr. Williams fired was not intended to kill anyone, but instead to go over the heads of anyone down the street. That is consistent with Mr. Williams' post-shooting behavior when he immediately walked away to the safety of the apartment building.

**2.  Reckless endangerment is the correct felony offense to consider under U.S.S.G. § 2K2.1(c)(1).**

**A.  The facts support a finding by the preponderance of the evidence that the felony of reckless endangerment in the first degree was committed with the charged ammunition offense for sentencing purposes under U.S.S.G. § 2K2.1(c)(1).**

New York State Penal Law § 120.25 defines reckless endangerment in the first degree as follows:

> A person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to

> human life, he recklessly engages in conduct which creates a grave risk of death to another person.

When viewed under a preponderance of the evidence standard, the facts support a finding that Mr. Williams committed reckless endangerment in the first degree in connection with the charged ammunition offense. Shooting a gun down the street in an urban area creates a grave risk of death to another person. Thinking that he could fire a shot in the general direction of people down the street was reckless and one could infer that such behavior evinces a depraved indifference to human life.

Surveying New York State caselaw, the circumstances surrounding Mr. Williams' conduct fall within the ambit of prosecutions for reckless endangerment in the first degree that have been upheld. *People v. Lobban*, 59 A.D.3d 566, 872 N.Y.S.2d 557 (2d Dept. 2009), *leave to appeal denied* 12 N.Y.3d 818, 881 N.Y.S.2d 26, 908 N.E.2d 934 (Sufficient evidence supported defendant's conviction for reckless endangerment in the first degree; based on the evidence presented, a rational jury could have concluded that, in firing a gun in the direction of complainant's retreating car, without actually hitting the car or its occupants with any bullets, the defendant created a grave risk of death under circumstances evincing a depraved indifference to human life, but did not specifically intend to kill or injure the complainants); *People v. Sherman*, 182 A.D.3d 987, 122 N.Y.S.3d 843 (4th Dept. 2020), *leave to appeal denied* 35 N.Y.3d 1048, 127 N.Y.S.3d 822, 151 N.E.3d 503 (Defendant's convictions for two counts each of second-degree criminal possession of a weapon and first-degree reckless endangerment were not against the

8

weight of the evidence, where evidence, including surveillance video and defendant's own statements to police, established that defendant was engaged in verbal altercation with the two victims at date and time shots were fired, victims identified defendant as shooter, bullet casings were found near defendant's house, and bullet holes and a bullet were found in the path that bullets would have taken if they were being fired from defendant's house toward the victims' residence); *People v. Heesh,* 94 A.D.3d 1159, 941 N.Y.S.2d 767 (3d Dept. 2012), *leave to appeal denied* 19 N.Y.3d 961, 950 N.Y.S.2d 113, 973 N.E.2d 211 (Evidence was legally sufficient to support defendant's conviction for first-degree reckless endangerment; defendant had made threats against his ex-girlfriend and her paramour in days leading up to a shooting at paramour's house, and bullets found in house matched spent casings found in backseat of defendant's vehicle); *People v. Payne,* 71 A.D.3d 1289, 897 N.Y.S.2d 292 (3d Dept. 2010), *leave to appeal denied* 15 N.Y.3d 777, 907 N.Y.S.2d 465, 933 N.E.2d 1058 (Evidence was sufficient to support defendant's conviction for four counts of reckless endangerment in the first degree; evidence established that defendant and his friends exchanged gunfire with another individual who was located across the street from their position, that three of the victims were in an apartment located directly behind the single shooter and the fourth victim was in an apartment located behind defendant and his friends, and that the victims' apartments were in or near the line of gunfire during the shootout); *People v. Payne,* 71 A.D.3d 1289, 897 N.Y.S.2d 292 (3d Dept. 2010), *leave to appeal denied* 15 N.Y.3d 777, 907 N.Y.S.2d 465, 933 N.E.2d 1058 (The statute

criminalizing reckless endangerment in the first degree does not require that a defendant be in close proximity to a victim; rather, in determining whether the crime was committed an objective assessment of the degree of risk presented by defendant's reckless conduct must be made); *People v. Teets*, 293 A.D.2d 766, 742 N.Y.S.2d 641 (2d Dept. 2002), *error coram nobis denied* 300 A.D.2d 415, 751 N.Y.S.2d 857, *leave to appeal denied* 100 N.Y.2d 543, 763 N.Y.S.2d 9, 793 N.E.2d 423 (In prosecution for reckless endangerment and menacing, evidence was legally sufficient to establish defendant's guilt and not against the weight of the evidence; conduct of aiming a loaded shotgun at complainants and discharging it in close proximity to them was reckless and created a grave risk of death); *People v. Menard*, 113 A.D.2d 972, 493 N.Y.S.2d 643 (3d Dept. 1985), *appeal denied* 68 N.Y.2d 772, 506 N.Y.S.2d 1056, 498 N.E.2d 158 (Proof that throughout heated dispute with victim defendant fired gun at least once in close proximity to victim was sufficient to support conviction for reckless endangerment in first degree); *see also People v. Richardson*, 97 A.D.2d 693, 468 N.Y.S.2d 114 (1st Dept. 1983)(Testimony that defendant stood eight feet from complainant, shot pistol in the air once, and then pointed weapon at complainant with verbal threat established either harassment with weapon consistent with crime of menacing or, at most, reckless endangerment in second degree, and evidence was sufficient to find defendant guilty of criminal possession of weapon in the second degree, but it was insufficient to establish guilt of reckless endangerment in first degree beyond a reasonable doubt).

**B.     The facts do not support a finding by the preponderance of the evidence that Mr. Williams intended to kill anyone with malice aforethought, thus both first and second degree murder are inapplicable under U.S.S.G. § 2K2.1(c)(1).**

Federal murder in the first degree is defined as follows:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.[3]

"The salient distinction between first-and second-degree murder is 'the requisite *mens rea.*'" *United States v. Torres*, No. 16 Crim. 809, 2022 WL 4355107, at *4 (S.D.N.Y. Sept. 20, 2022)(quoting *United States v. Cespedes*, No. 11 Crim. 1032, 2015 WL 4597539, at *3 (S.D.N.Y. July 30, 2015)(quoting *Untied States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000))). "First-degree murder requires both malice aforethought and premeditation, 'the specific intent to commit an unlawful killing.'" *Cespedes* at *3 (citations omitted). Premeditation "requires a 'cool mind' that is capable of reflection" and that "the one with the 'cool mind' did, in fact, reflect at least for a short period of time before his act of killing." *Id.* (quoting *United States v. Mulder*, 273 F.3d 91, 117 (2d Cir. 2001)(quoting *United States v. Shaw*, 701 F.2d 367, 393 (5th Cir. 1983))). "[N]o particular period of time is

---

[3] 18 U.S.C. § 1111(a).

necessary for such deliberation and premeditation." *Id.* (quoting *Shaw*, 701 F.2d at 392-93 ("The period of time 'does not require the lapse of days or hours or even minutes.'" (quoting *Bostic v. United States*, 94 F.2d 636, 638 (D.C. Cir. 1937), *cert. denied*, 303 U.S. 635 (1938))). "Instead, 'it is the fact of deliberation, of second thought[,] that is important.'" *Id.* (quoting *United States v. Catalan-Roman*, 585 F.3d 453, 474 (1st Cir. 2009)).

"Second-degree murder, by contrast, is a general intent crime that requires only malice aforethought." *Id.* (quoting *Cespedes*, 2015 WL 4597539, at *4 (quoting *Wood*, 207 F.3d at 1228)). "[S]econd degree murder's malice aforethought element is satisfied by: (1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent-to-do-serious-bodily-injury; [or] (3) depraved-heart[.]" *Id.* (quoting *United States v. Regnier*, 44 F. App'x 524, 529 (2d Cir. 2009) (summary order) and citing *United States v. Velazquez*, 246 F.3d 204, 214 (2d Cir. 2001) ("[T]he requisite malice can in some circumstances be found when the assailant acts with awareness of a 'serious risk of death or serious bodily harm.'")(citation omitted)).

In its initial sentencing memorandum, the government lists a plethora of cases supporting the proposition that the intent to kill "may be (and usually is) inferred from circumstances alone." Gov't. Sent. Memo. at 4-5, Doc. No. 22, filed 08/23/2022. The common theme in the cases cited by the government is that the defendant in those cases shot another person *at close*

12

*range*. In several of the cases, the defendant not only shot the decedent at close range, but also shot at the decedent multiple times.

Here, the circumstances are vastly different. The video reflects that Mr. Williams, who was in the neighborhood equivalent of his own front yard, did not initiate the shooting. Mr. Williams discharged one round at armed men at least one half a block away with at least one car blocking the line of sight. After shooting one round, Mr. Williams then immediately removed himself from the area by returning to the family apartment. These facts do not come close to the circumstances that warrant a finding that an intent to kill existed.

Mr. Williams lacked premeditation. While Mr. Williams initially was angry about how Cerezo had endangered Mr. Williams' life and the lives of Mr. Williams' loved ones, by 9:15 p.m. Mr. Williams had been able to sort through the events and realize that Cerezo was seeking to retaliate against Drama for being robbed and that the dispute between Cerezo and Drama did not involve Mr. Williams. Mr. Williams did go back on the sidewalk with a gun, but he had no plan to kill anyone. If Mr. Williams had premeditation, the circumstances would have been different. For instance, Mr. Williams would have gone around the neighborhood looking for Cerezo; he would have fired more shots; he would not have left the scene after firing only one shot; and he would not have let the driver or the man in the Bodega leave the scene so easily to name a few likely scenarios.

Besides lacking an intent to kill or premeditation, Mr. Williams did not have malice aforethought when he shot the gun. In his mind, he thought he was protecting himself and his family from unknown armed assailants who attacked Mr. Williams and his family and friends in the equivalent of the Williams' front yard. Mr. Williams believed he had a right to defend himself and his loved ones after they were attacked; such a belief negates the notion that Mr. Williams acted with malice aforethought.

The lack of malice aforethought is supported not only by the events captured in the video footage, but also by Mr. Williams own words when discussing the incident during his post-arrest interview. Mr. Williams did state that initially he was mad and went to get his "shit" and change clothes, however, after Mr. Williams' initial anger, he began to piece together that Cerezo and Drama had a dispute that did not involve him. By the evening around 9 p.m. when Mr. Williams and those with him were on the sidewalk, Mr. Williams explained that "it wasn't like we was looking for anything, we was just chilling." Gov't. Ex. C at 6:10. Mr. Williams continues to explain that he was huddled up with others on the sidewalk when the unknown men drove up, "[s]o as we looking at them I just heard a shot going off I don't know who shot the first shot then [people] started shooting at each other but none of that shit was our problems." *Id.* at 7:34. By that, Mr. Williams meant that the shooting was not instigated by Mr. Williams and that the shooting should have never involved Mr. Williams and people with him because the problem was between Cerezo and Drama. It had nothing to do with gangs – it was fallout

14

from the personal dispute between Cerezo and Drama.

It should be noted that if Mr. Williams was ever charged by the Bronx District Attorney's Office for attempted murder or any other act of violence relating to this shooting, he would be entitled to raise self-defense as a complete defense to such charges. Acting in self-defense, even imperfectly, precludes the existence of the requisite *mens rea* to be convicted of murder in the first or second degree.

Looking at all of the facts through a preponderance of the evidence standard, Mr. Williams did not have malice aforethought or an intent to kill. The lack of malice aforethought negates both murder in the first and second degree as applicable felonies under the 2K2.1(c)(1).

**C.    Transferred intent is recognized in the Second Circuit, however it is inapplicable because Mr. Williams did not have the requisite *mens rea* to commit murder in the first or second degree.**

"The doctrine of transferred intent, in its traditional application, permits the fact-finder to attribute or 'transfer[ ]' to a defendant who shoots at one person with intent to kill and inadvertently kills another the intent to kill the second person." *United States v. Rahman*, 189 F.3d 88, 141 (2d Cir. 1999)(citing 4 W. Blackstone, *Commentaries* *200–01 (Harper ed. 1854)). The doctrine has been recognized by the Supreme Court and the Second Circuit. *Id.* (citations omitted).

As outlined above, Mr. Williams did not have malice aforethought or intent to kill. Thus, there is no applicable intent that could have been transferred to a third party.

In addition, the facts bear out that Mr. Williams did not know who the 2 men

down the street were. The two men appeared to pose a novel threat unrelated to Cerezo or Drama. Mr. Williams was not trying to kill either of those men, and was not trying to kill Cerezo or anyone else when he fired his gun.

### D. Aggravated assault is inapplicable under U.S.S.G. § 2K2.1(c)(1).

Under Application Note 1 of U.S.S.G. § 2A2.2, aggravated assault is defined as follows:

> For purposes of this guideline:
>
> "Aggravated assault" means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.

Applying this generic definition of aggravated assault to the facts at hand demonstrates that aggravated assault should not be an applicable felony under U.S.S.G. § 2K2.1(c)(1). Mr. Williams did not have the intent to cause bodily injury, but rather intended to protect himself and his loved ones. Thus, there was no felonious assault. At most Mr. Williams intended to frighten the 2 men down the street, which also negates subsection (A) above. No serious bodily injury ever occurred and no strangling or suffocation was involved. Subsection (D) is also inapplicable.

## Conclusion

Reckless endangerment in the first degree is the only appropriate felony to be considered under U.S.S.G. § 2K2.1(c)(1). Accordingly, no cross-reference offense level substitution is warranted because reckless endangerment in the first degree does not have an offense level higher than 18. Thus, the Court should adopt the Guidelines analysis submitted by the Probation Office and Mr. Williams.

Dated:  Bronx, New York
        September 26, 2022

                                         Respectfully submitted,

                                         _____/S/_____
                                         SEAN M. MAHER
                                         *Counsel for Defendant Qaadir Williams*

                                         The Law Offices of Sean M. Maher, PLLC
                                         2796 Sedgwick Avenue, Suite C1
                                         Bronx, NY 10468
                                         (212) 661-5333
                                         smaher@seanmaherlaw.com